IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


RUDY GRIEGO,

        Plaintiff,

v.                                                     CIV 01-677 MCA/KBM

JO ANNE B. BARNHART,[1]
Commissioner of Social Security,


## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

This matter is before the Court on Plaintiff's Motion to Reverse or Remand. *Doc. 7.* I have carefully considered the entire record and recommend that the motion be granted and the matter remanded to the Commissioner for further proceedings.

### I. Background

When the Administrative Law Judge ("ALJ") held his hearing on January 12, 2000, Plaintiff was forty-eight years old. *Administrative Record* ("*Record*") at 15. Plaintiff has a high school education and performed heavy labor as an underground miner for 25 years. *Id.* at 109. Not surprisingly, the work took a toll on him physically.

Plaintiff's treating physician of long-standing is Dr. Y. Heilbronn. After a work accident resulted in a December 1995 operation for herniated cervical discs "C5-6, C6-7" and "nerve root impingement especially on the left side at these levels," *id.* at 146-47, Plaintiff soon recovered and

---

[1] On November 9, 2001, Jo Anne B. Barnhart was sworn in as Commissioner of Social Security. In accordance with FED. R. CIV. P. 25(d)(1), Ms. Barnhart is substituted for Larry G. Massanari as the Defendant in this action.

was released to perform heavy work eight hours a day in March 1996, *id.* at 175-79, 184, 244. In September 1997 Plaintiff continued to work but underwent physical therapy. Dr. Heilbronn concluded that the physical therapy "helped to a point where he is almost asymptomatic now." *Id.* at 239.

On June 1, 1998, Dr. Heilbroon saw Plaintiff again. At that time Plaintiff was complaining of neck pain with radiating pain in his limbs, and numbness and weakness in his left arm. Dr. Heilbroon also noted that Plaintiff exhibited symptoms of hypertension, and attributed those symptoms and Plaintiff's chronic pain to Plaintiff's "worries about his job with the mine closing soon." *Record* at 238. Dr. Heilbroon admitted Plaintiff to perform a "CT" scan and other such tests, *see id.* at 234, 238, and referred Plaintiff to Dr. S. Kankanala to evaluate and treat the hypertension, *id.* at 235.

As a result of the tests, Dr. Heilbroon recommended surgery and also prescribed physical therapy and a limited amount of pain medication. *Id.* at 236; *see also id.* at 197. Dr. Kankanala found Plaintiff mildly hypertensive, prescribed a medication, and wanted to recheck in three months. *Id.* at 225. Dr. Heilbroon noted that Plaintiff wanted "to apply for social security disability," *id.* at 232, and Plaintiff did, at age forty-six, alleging an onset of disability as of June 7, 1998 due to his neck and knee conditions.[2]

Thereafter, in October 1998, Plaintiff saw a physician about his arthritic left knee. *Id.* at 227. Plaintiff's problems with this knee date back to young adulthood and over the years he

---

[2] *See Record* at 94, 101, 333. As Defendant notes, Plaintiff filed for disability benefits alleging June 7, 1998 as the onset date and then later filed for supplemental security income benefits on July 20, 1998. *See Doc. 9* at n.2. Because the periods overlap, the parties and I simply refer to the June 7th date as the onset date.

underwent various procedures to provide relief. *See id.* at 265, 270.

In November 1998, the Social Security Administration apparently informed consulting physician Dr. Aida Recalde that Plaintiff said "he has no surgery scheduled or planned due to lack of funds." *Id.* at 255. Dr. Recalde reviewed the medical records and on November 5, 1998, found Plaintiff could perform tasks consistent with light work.[3] She did not find that Plaintiff needed to alternate sitting and standing to relieve pain or discomfort. *Id.* at 257. Referencing this assessment, the Administration found Plaintiff not disabled. *Id.* at 68 (dated 11/6/98); *see also* 70-71 (dated 11/13/98).

On November 17, 1998, Dr. Heilbronn noted Plaintiff had gained twenty pounds since June and again recommended surgery. He also noted that he discussed "the need for a functional capacity evaluation" with Plaintiff and his wife. After the evaluation, Dr. Heilbronn could perform an outpatient procedure for the carpal tunnel symptoms and then refer Plaintiff "for a permanent impairment evaluation according to AMA guidelines by a rehabilitation or physical medicine specialist." *Id.* at 231. Dr. Heilbronn further noted that he was waiting for Plaintiff's assent to the proposed intervention. *Id.* Two days after these notes, however, Dr. Heilbronn released Plaintiff to return to work for "light duty only." *Id.* at 230.

Approximately a week after he was released for light duty, Plaintiff saw Dr. William Baggs complaining that his left knee was starting to bother him again. Plaintiff declined to undergo another surgery and indicated he would think about injections. *See id.* at 265, 270.

---

[3] With occasional postural limits and limits in reaching and gross manipulation, Dr. Recalde found Plaintiff could lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk with normal breaks for at least 2 hours in an 8-hour workday, and sit with normal breaks for a total of 6 hours in an 8-hour workday. Another consulting physician adopted those findings. *See Record* at 257-63; 20 C.F.R. § 404.1567(b).

3

About a year later, Dr. Heilbronn noted on September 30, 1999 that Plaintiff's carpal tunnel syndrome was "markedly subsided," but that his neck/shoulder pain and tinging and numbness continue "off-and-on." *Id.* at 287. Although Dr. Heilbronn again recommended surgery, Plaintiff "has a very strong fear of surgery and does not wish to take the route." *Id.* Therefore, Dr. Heilbronn prescribed a course of physical therapy. *Id.*

A few days later, on October 4, 1999 and when he was forty-seven years old, Plaintiff began working as a gatekeeper. *See id.* at 27, 31, 37-38, 41. He also began a course of physical therapy with R.D. Bhatt. *See id.* at 276-73. He saw the therapist at regular intervals, with his last visit on November 1, 1999. The therapist's notes indicate that as of his last visit, Plaintiff had "very mild headaches," his neck pain was "greatly reduced," the soft tissue around his neck "reduced in size and in tenderness," but that he still had soreness in his left trapezious and numbness in his left arm. As with the other visits, Plaintiff was recommended a "home program." *Id.* at 273. Therapist Bhatt's report to Dr. Heilbronn reported the above findings as well as improvement in mobility, strength, function, and relief of pain. *Id.* at 281. Although most of the therapist's treatment notes indicate Plaintiff did not have headaches, Bhatt's report to Dr. Heilbronn notes "persistent headaches." *Id.* at 280. Dr. Heilbronn continued to recommend surgery and for Plaintiff to lose weight. *Id.* at 286.

Plaintiff continued working as a gatekeeper throughout his physical therapy and continued to hold that position as of the hearing before the ALJ. On January 11, 2000, the day before the hearing, therapist Bhatt executed a "residual functional capacity assessment" on a different form from that used by Dr. Recalde. Therapist Bhatt's form specifically finds that Plaintiff has limitations since "at least September 1998" such that he must alternate sitting and standing every

4

thirty minutes. *Id.* at 285.

## II. Standard Of Review

If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and Plaintiff is not entitled to relief. *E.g., Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1497-1500 (10th Cir. 1992). My assessment is based on a review of the entire record, where I can neither reweigh the evidence nor substitute my judgment for that of the agency. *E.g., Casias v. Sec'y of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1028 (10th Cir. 1994) (internal quotations and citations omitted). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir. 1994) (citation omitted).

Although the ALJ called a vocational expert and elicited her opinions, his decision at step five ultimately relies exclusively on the "grids." The grids "are tables prepared by the Secretary which evaluate a claimant's ability to work by matching the claimant's age, education, and work experience with his work capability." *Trimiar v. Sullivan,* 966 F.2d 1326, 1332 (10th Cir. 1992). They are a "shortcut that eliminate the need for calling in vocational experts" and "set forth presumptions regarding whether jobs exist in significant numbers in the national economy given the particular limitations possessed by the claimant." *Id.* (internal quotations and citations omitted).

## III. Analysis

The dispositive issue in this appeal is whether the ALJ correctly concluded that Plaintiff

5

retains the residual functional capacity to perform a full range of sedentary work. If so, then the grids compel a finding of nondisability for Plaintiff's age group regardless of whether Plaintiff has any transferrable skills. Having carefully considered the ALJ's written opinion, I find that the basis for his conclusion Plaintiff is not entirely credible and can perform sedentary work rests on two facts: (1) Plaintiff was substantially gainfully employed[4] at the time of the hearing, and (2) Plaintiff did not elect to have surgery. *See id.* at 18. Further, based on the nondisability finding alone, the ALJ refused to consider Plaintiff's work as a gatekeeper as a "trial work period." I conclude that the ALJ failed to apply the correct legal standards in relying on the grids, assessing Plaintiff's credibility, and in concluding Plaintiff was not entitled to a trial period of work.

### *A. Alternate Sitting And Standing*

"Sedentary work" is defined as

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1576(a). "'Occasionally' [walking and standing] means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. **Sitting would generally total about 6 hours of an 8-hour workday.**" *Social Security Ruling 96-9p,* 1996 WL 374185 at *3 (emphasis added); *see also e.g., Smith v. Barnhart,* 35 Fed. Appx. 805, 2002 WL 1023678 at *1 (10th Cir. 5/22/02) (unpublished) (quoting same); *Burns v.*

---

[4] Plaintiff conceded that the work as a gatekeeper constituted substantial gainful activity. Plaintiff requested, however, "that it be treated as a trial work period. This being a classic case where we think that that serves its purpose." *Record* at 31-32.

6

*Apfel,* 145 F.3d 1345, 1998 WL 278535 at *2 (10th Cir. 1998) (quoting *Social Security Ruling 83-10,* 1983 WL 31251 at *5).

Plaintiff contends that two limitations preclude him from doing sedentary work: the requirement that he alternate sitting and standing, and disabling pain. *See Doc.* 8 at 8; *Doc. 10* at 2. The Tenth Circuit holds that if a person needs to alternate sitting and standing, an ALJ cannot rely on the grids:

> When a claimant's exertional level, age, education, and skill level (i.e., work experience) fit precisely within the criteria of a grid rule, an ALJ may base a determination of nondisability conclusively on the grids. *See Trimiar v. Sullivan,* 966 F.2d 1326, 1332 (10th Cir.1992); *see also* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a) & Table No. 1; *Social Security Ruling 82-41,* 1982 WL 31389, at *1. When a requirement to alternate sitting and standing limits a claimant's ability to do the full range of sedentary work, as in this case, an ALJ may not rely on this shortcut method. *See Thompson,* 987 F.2d at 1488; 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e).

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999); s*ee also Ragland v. Shalala,* 992 F.2d 1056, 1059 n. 4 (10th Cir. 1993).[5] Social security rulings also recognize that the need to alternate sitting and standing may not support a finding that the claimant is capable of performing all sedentary work, particularly in unskilled positions. The pertinent part of Ruling 83-12 provides in full:

> SPECIAL SITUATIONS
>
> 1. Alternate Sitting and Standing
> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of

---

[5] Indeed, the Tenth Circuit reversed a decision of this district and its reasoning included that where "the claimant requires a sit/stand option, it is inappropriate for the ALJ to rely on the grids, and he must consult a vocational expert." *Goodwin v. Apfel,* 166 F.3d 1221 (10th Cir. 1998) (unpublished, but not attached).

7

> either sedentary or light work except that the person must alternate periods of sitting and standing. *The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work* (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. *(Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)*
>
> There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice. *If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled.* However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. *Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a [vocational expert] should be consulted to clarify the implications for the occupational base.*

1983 WL 31253 at *4 (emphasis added).

The medical evidence of Plaintiff's need to alternate sitting and standing limitation is found in therapist Bhatt's disability evaluation. The regulations provide that in addition to physicians, the Administration "may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work. Other sources include, but are not limited to — (1) Medical sources [other than for example, physicians] physician's assistants, naturopaths, chiropractors, audiologists, and therapists." 20 C.F.R. § 404.1513(d). Therapist Bhatt's 2000 questionnaire relates that Plaintiff can only stand for thirty minutes at one time, can only sit for one hour at a time, and must alternate sitting and standing or walking every thirty minutes. *Id.* at 282. The questionnaire gives the impression that these limitations have persisted from September

1998 to the day before the hearing.

At the hearing, the vocational expert testified that based on Bhatt's assessment, there is no work available to Plaintiff, *Record* at 60, and that the gatekeeper job he was doing is "very limited employment," *id.* at 61, *see also id.* at 59. Yet, the ALJ's opinion did not discuss Bhatt's findings at all. While the ALJ is not necessarily bound by such opinions, he is required to consider the potentially decisive conclusion by a treating "acceptable medical source" and to give reasons why he apparently discounted the conclusion entirely.[6] Because the ALJ wholly ignored Bhatt's assessment of Plaintiff's alternate sitting and standing limitations and relied solely on the grids, the matter must be remanded for further proceedings.

### B. Credibility

At the hearing Plaintiff sat and stood alternatively during the hearing and testified to limitations in sitting and standing consistent with Bhatt's findings. The ALJ did not find Plaintiff wholly credible on the issue of functional limitations and pain. As best I can discern, he gave three reasons for doing so. The record does not support two of the reasons and the final reason is insufficient to sustain the credibility determination.

The ALJ first stated that he "seriously" questioned whether someone suggested Plaintiff

---

[6] *E.g., Kemp v. Bowen,* 816 F.2d 1469, 1475-76 (10th Cir. 1987) ("While the ALJ agreed that plaintiff's impairments limited her ability to stand or to walk in a vocational environment, he totally ignored all of the medical evidence which established that she was also unable to sit for any length of time because of circulatory problems associated with vein stripping and surgery on her legs. In this respect the ALJ finding is similar to that which we reversed in *Jozefowicz* [*v. Heckler,* 811 F.2d 1352 (10th Cir. 1987).]"); *see also e.g., Roberts v. Barnhart,* ___ Fed. Appx. ____ (10th Cir. 6/12/02) (unpublished) (citing *Jozefowicz* for the proposition that the "ALJ's recitation of some of the other medical evidence" did not cure defect in failing to give specific reasons for rejecting disability opinion of treating physician); 20 C.F.R. 404.1527 (b) ("In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive.").

9

sit and stand during the hearing, because Plaintiff "admitted he is able to sit for 30 minutes at a time without having to stand," such as when he drives to work, and because Plaintiff "described [the gatekeeper position] as sedentary to light . . . with *sitting for three hours, standing for three hours, and walking for two hours during a regular eight-hour day.*" *Record* at 18 (emphasis added). Having reviewed the testimony I cannot conclude that the remarks in quotations fairly summarize Plaintiff's testimony. In context, the portions of Plaintiff's testimony that relate to his ability to sit, stand, and walk on the job provide:

> Q: Tell me what you do at that job?
> A: We . . ., well what I'm doing now. Just watch a gate.
> Q: You can do anything you want here, as along as you are comfortable. As long as we can record you.
> A: Right.
> Q: If you feel like getting up, do so.
> A: I, I have an office in a building with three windows, and watch the gate and log in the salt trucks as they go out and come and make sure nobody else goes in or out.
> Q: So, it's security work too.
> A: Well, basically, yeah. If somebody does go in or out that's not supposed to, I call security.
> \* \* \* \* \*
> Q: Okay. You are mostly sitting down, huh?
> A: Well, yes.
> Q: The job? Does it require any walking, standing, anything else?
> A: No, just be there.
> Q: Well, do you sit and you can see out the windows?
> A: Yes.
> Q: So you don't have to walk around or stand up very much?
> A: No.
> Q: Okay. You don't have to lift things, or –
> A: No, a pencil.
> Q: Huh?
> A: A pencil.
> Q: A pencil is about it, huh. A lot different from what you did isn't it?
> A: Quite a bit.
> \* \* \* \* \*

10

Q: You don't think you can do a job where a lot of walking might be required?
A: No.
Q: How about sitting? Are you okay sitting? Today the record [commencing at 4:12 p.m.] should reflect that you sat down and you got up pretty quick?
A: No, I don't sit too long.
Q: How long can you sit for?
A: Five, ten minutes.
*Q: How much sitting are you doing with your job you are on now?*
*A: Well, in the mornings I can – I do pretty good for about two hours and after that, it's just like it is now. It's just up and down. Sometimes it could be 15, 20 minutes. Other times –*
*Q: All right.*
*A: It varies.*
*Q: All right. If doesn't interfere with that particular job, you can do that all right. Sit down and get up. Sit down and get up.*
*A: and then I can – well, after a while, you are up and down and then my neck will get tight. Before long, my arm hurts, and then once that starts, I start getting a headache.*
Q: So your other parts start hurting?
A: Then I'll start getting into my lunch bucket and start taking medications.
*Q: Okay. Standing? Do you have the same problems standing?*
*A: Well, yeah.*
*Q: How long can you stand for at a time?*
*A: If I can walk and stand at the same time, that will be about 20 minutes, 30 minutes if I can move around.*

\* \* \* \* \*

*Q: How much driving do you do?*
*A: Thirty minutes is about max.*
Q: Back and forth to work?
A: Yeah.
Q: How far is that?
A: Just 32 miles.
Q: One way?
A: One way.
Q: Are you able to do that?
A: Yeah, afternoons are tough. I get sleepy.

*Record* at 37-38, 44, 47-48 (emphasis added).

The second reason the ALJ discounted Plaintiff's testimony was because

> claimant testified he thinks he is going to have cervical surgery. ***He did not explain how he had overcome his fear of surgery*** in such a short time [meaning from September 1999 to January 2000].

*Id.* at 18 (emphasis added). Yet, this conclusion again mischaracterizes Plaintiff's testimony. After the ALJ noted that Plaintiff had five surgeries on his knee, *id.* at 40, Plaintiff explained as follows:

> Q: How often are you seeing the doctor now or any doctor?
> A: Just whenever I get ready to go have the surgery I guess.
> Q: You are going to have another one?
> A: Well, it looks like (INAUDIBLE).
> \* \* \* \* \*
> A: . . . they want to put in a metal plate. They want to fuse four vertebras.
> Q: Have they got a surgery scheduled, or are they just talking about it?
> A: No, I'm afraid to do it. I've had enough. It seems like I have one surgery, and then I need two, and then if I need two, I'll need four.
> Q: You don't think you'll do it?
> A: How is that?
> Q: You don't think you'll go ahead and do it?
> *A: Well, I'm getting to the point where I almost have to do it. (INAUDIBLE).*
> *Q: You are trying to hold off as much as you can?*
> *A: Right. I can't get any guarantees. It's the same way with the knee. Just go in there and clean it out again, and all I wanted was (INAUDIBLE).*
> \* \* \* \* \*
> Q: So what are you going to do from here on it do you think? Are you going to stay with that job?
> A: I don't know. Probably not.
> Q: What would you do?
> A: Well, I'm going to have to probably have that surgery done, and see what (INAUDIBLE) through that – after that. It might be – I don't know what the – I don't have a long time – I'm not looking into the future too far.
> *Q: Okay. Well, the surgery could make you feel better too, I guess. We don't know.*

12

*Record* at 41-42, 54 (emphasis added).

Furthermore, "before the ALJ may rely on the claimant's failure to pursue treatment or take medication as support for his determination of noncredibility, he or she should consider 'whether the treatment was (1) prescribed and refused and (2) would restore Plaintiff's ability to work and, if so (3) whether Plaintiff's refusal was "without justifiable excuse.'" *Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir. 1993) (internal quotations and citations omitted). The ALJ here did not consider these factors. In fact, the ALJ himself indicated it was unclear whether surgery would make Plaintiff "feel better."

The final reason the ALJ found Plaintiff's testimony less than credible was because Plaintiff "also testified about a variety of symptoms related to his pain, such as impaired concentration, worse pain in bad weather, etc. However there is no indication in the medical record that the claimant had ever complained of such to any of his doctors." *Id.* at 18. Nonetheless, "the absence of an objective medical basis for the degree of severity of pain may affect the weight to be given to the claimant's subjective allegations of pain, but a lack of objective corroboration of the pain's severity cannot justify disregarding those allegations." *Thompson,* 987 F.2d at 1489 (internal quotations and citations omitted).

### *C. Trial Period*

Based on the finding that Plaintiff was not disabled at any time, the ALJ thus concluded that he was also not entitled to have the gatekeeper job considered as a "trial period" of work. As the nondisabled conclusion cannot stand, the decision about the trial period likewise cannot stand and must be reassessed during the proceedings on remand. *See Walker v. Secretary of Health & Human Servs.,* 943 F.2d 1257 (10th Cir. 1991); *Acquiescence Ruling, 92-6(10),* 1992 WL 466904

13

(9/17/92).

Wherefore,

**IT IS HEREBY RECOMMENDED THAT** the motion be granted and the matter remanded to the Commissioner for further proceedings, including taking additional evidence and conducting another hearing, if necessary.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the ten day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE